HENRY A. McLEAN AND HATTIE T. McLEAN *v.* WINDHAM LIGHT

AND POWER COMPANY AND JAMAICA LUMBER COMPANY.

January Term, 1911.

Present:   ROWELL, C. J., MUNSON, WATSON, HASELTON, AND POWERS, JJ.

Opinion filed October 10, 1911.

*Logging Contracts—Construction—Acts of Parties—Meaning of Language—Vendor and Purchaser—Bona Fide Purchaser—Time as the Essence of Contracts—Fairness of Agreement—Sale of Standing Timber—Correction of Determination of Quantity—Husband and Wife—Contracts—Agency of Husband.*

The mere fact that a party to a contract, in circumstances of doubt, goes beyond its requirements and acts in accord with the claim of the other

party does not amount to such a conceded interpretation of the contract as the court ought to follow in determining the rights of the parties.

A contract should be so construed, if possible, as to give effect to every part thereof.

Ordinarily, the language of a particular provision of a contract should be construed in the light of its purpose as gathered from a consideration of the contract as a whole.

Where a vendor of real estate, with a mortgage thereon securing the purchase price, bought the vendee's equity therein with knowledge of a third person's rights under a written contract with the vendee for the premises, the vendor, beyond his right to payment of the mortgage indebtedness, stood in no better position than the vendee, in respect of the third person's rights.

The rule that in ordinary cases time is not of the essence of a contract of sale of real estate where there is nothing special in the objects, subject-matter, or terms thereof, though a designated time is fixed for its fulfillment, does not apply where the contract plainly discloses an intention to make exact performance as to time an essential element of the contract, nor when failure to perform is wilful, or the delay unreasonably prolonged; nor when the party entitled to performance has been so injured that complete reparation is impossible.

Equity will not treat time as of the essence of a contract of sale of real estate unless it affirmatively and clearly appears that the parties so regarded it, but that may be accomplished either by express stipulation, or by implication from the nature of the property or the avowed objects of the parties, or it may be made essential by a change in the value of the land, or by other circumstances that make a decree of specific performance inequitable; but it is not sufficient that a specified time for performance be named in the contract, for the court will look at the whole transaction to determine whether the parties really meant the time named to be of the essence of the contract.

In seeking the intention of the parties to a contract, regard must be had to its subject-matter as well as to its language.

A contract for the sale of timber standing on mortgaged land fixed the price at a designated sum per 1,000 feet, and provided that payments should be made to the mortgagee as the mortgage notes fell due, and that, on discovering that there would not be timber sufficient to pay the amount of the mortgage indebtedness, the purchaser might terminate the contract, if that were done when a certain mortgage note fell due. There was no express provision of the contract requiring that, on failure to rescind, the purchaser should pay the mortgage indebtedness, regardless of the amount of timber. *Held*, that the privilege of terminating the contract was a mere option, and, on failure of the purchaser to exercise it because there was a shortage of timber, though he continued to act under the contract, he was not bound to pay the full amount of the mortgage indebtedness.

When the terms of a contract leave its meaning doubtful, the court will ascribe to the parties an intention to enter into a fair agreement, and will adopt the construction that makes the contract equitable.

Where scalers selected by the parties to a contract for the sale of timber erroneously scaled poplar logs as hard wood, and no action had been taken by the parties because of that classification, it could be corrected by the court.

Where on the trial no question was made as to a husband's authority to act for his wife in the purchase of property, and a part of the consideration was paid by a check in the name of a firm consisting of the husband and wife, and the wife did not urge that this payment was unauthorized, and no distinction was made between the husband and wife as to notice of the rights of a third person in such property, the wife, as well as the husband, took the property subject to such notice.

APPEAL IN CHANCERY.  Heard in the pleadings, including a cross bill by the Jamaica Lumber Company, and a master's report, at the September Term, 1909, Windham County, *Hall*, Chancellor.  Decree in favor of the Jamaica Lumber Company. The orators appealed.  The opinion fully states the case.

*Gibson & Waterman, A. V. D. Piper* and *J. K. Batchelder* for the orators.

The Jamaica Lumber Company have no right to be subrogated for they have paid only what they were obliged to pay under the terms of their contract.  *Carlton* v. *Jackson,* 121 Mass. 592; *Wilson* v. *Burton,* 52 Vt. 394; *Roiux* v. *Ryegate Brick Co.,* 72 Vt. 148; *McMillan* v. *Titus,* 72 Atl. 240.  And if its payment was not so obligated, then that payment was voluntary, and so cannot entitle to subrogation.  *Nichol* v. *Dunn,* 25 Ark. 129; *Rodman* v. *Sanders,* 44 Ark. 504; *Kline* v. *Ragland,* 47 Ark. 111; *Nat. Bank* v. *Cushing,* 53 Vt. 326.

*Clarke C. Fitts* and *Hermon E. Eddy* for the Jamaica Lumber Company.

The Court should construe the contract in such a way as will make it reasonable rather than unreasonable, and just to both parties rather than unjust.  *Merriam* v. *U. S.,* 107 U. S. 437; *Noonan* v. *Bradley,* 9 Wall. 395; *Royalton* v. *Turnpike Co.,* 14 Vt. 311.

The provision of the contract giving the Jamaica Lumber Company the right to terminate the contract at a designated time does not make that time of the essence of the contract, because to adopt that construction would make the contract an unfair one. In construing this clause, the rule of equity must be applied. It is a fundamental doctrine that in all cases of contract, equity does not regard time as the essence of the agreement. For instance, in ordinary contracts for sale of land, although a certain period of time may be stipulated for its completion or for the execution of any of its terms, equity treats the provision as formal rather than essential and permits the party that has suffered the period to elapse afterwards to perform the terms, notwithstanding the lapse of time and the delay of the party whose duty it is to act. This general principle, it is true, is subject to the limitation that the delay must not be wilful and intentional and must not have worked any harm to the other party. 4 Pom. Eq. Jur. (3d Ed.) §1408, and cases cited; *Huffum* v. *Himmin*, 17 N. J. Eq. 266; *Sharpe* v. *Trimmer*, 24 N. J. Eq. 425; *Hubbell* v. *Vaughn Schoening*, 49 N. Y. 331; *Dressel* v. *Jordan*, 104 Mass. 415; *King* v. *Ruckman*, 20 N. J. Eq. 319; *Grigg* v. *Lambis*, 19 N. J. Eq. 353. The orators, having purchased with full knowledge of the rights of the Jamaica Lumber Company, have no better rights as against that company than have the Windham Company from whom orators purchased. Pom. Eq. (3d Ed.) §688; *Smith* v. *Shane*, Fed. Cas. 13105; *Sowles* v. *Butler*, 71 Vt. 278; *Shaw* v. *Beebe*, 35 Vt. 204; *Gilchrist* v. *VanDyke*, 63 Vt. 75; *Cushman* v. *Blanchard*, 2 Me. 266.

The Jamaica Lumber Company is entitled to be subrogated to the rights of the mortgagee. "In general when any person having a subsequent interest in the premises, and who is therefore entitled to redeem for the purpose of protecting such interest, and is not the principal debtor primarily and absolutely liable for the mortgage debt, pays off the mortgage, he thereby becomes an equitable assignee thereof, and may keep alive and enforce the lien so far as may be necessary in equity for his own benefit. He is subrogated to the rights of the mortgagee to the extent necessary for his own equitable protection." *Pom.* Eq. Jur. (3d. Ed.) 1212; *Davis et al.* v. *Davis et al.*, 81 Vt. 264; *Wilder Exr.* v. *Wilder & Deavitt,* 82 Vt. 123.

Munson, J.   On the first day of September, 1906, Henry A. McLean and Hattie T. McLean, the petitioners herein, referred to in the contract mentioned hereafter as H. A. McLean & Co., conveyed to the Windham Light and Lumber Company, one of the defendants, hereinafter called the Windham Company, certain real estate in Jamaica which included timber lands and a saw mill.   On the same day the Windham Company executed to the McLeans a mortgage of said premises to secure the sum of $17,000, specified in four notes; one for $7,500, payable December 1, 1906; one for $3,200, payable March 1, 1907; one for $3,200, payable June 1, 1907; and one for $3,100 payable September 1, 1907.   On the 26th day of March, 1907, the first note having been paid when due, and the second note being then past due and unpaid, the Windham Company sold to the Jamaica Lumber Company, the other defendant, hereinafter called the Jamaica Company, the timber standing on certain of the incumbered lots and the logs and lumber in the mill yard; which sale was evidenced by a deed of the standing timber and a written contract between the parties.   The construction and effect of this contract are the principal matters in dispute.

The contract fixes the prices to be paid by the thousand feet, and provides that payment shall be made to H. A. McLean & Co., or their assigns of record, as the three unpaid notes of the Windham Company held by them become due, and proceeds as follows:   "It being distinctly understood and agreed that each and every note after being paid shall be marked as cancelled and immediately returned to" the Windham Company, and that "a partial release from the mortgage * * securing said notes shall, at the time of payments, be entered for record at the office of the town clerk."   It is provided further that upon the delivery of the contract and deed, the Jamaica Company shall pay to the Windham Company the difference between the amount to be paid to H. A. McLean & Co. on the first note, and $4,000.   The contract then provides for the selection of surveyors, "who are to measure all the timber purchased from time to time as mutually agreed except the lumber sawed," and to measure this lumber when loaded, and whose measurements are to be the basis of settlement.   It is also provided that the Windham Company shall pay to the Jamaica Company

"interest at the rate of six per cent per annum for all money advanced until a sufficient amount of lumber and logs have been measured to equal in value the amounts of the said advances," but that in no event shall any interest be paid after two years from the date of the contract. A further provision of importance to our inquiry is, with slight changes of form, as follows: Seven days prior to the maturity of the note due June 1, 1907, by notice in writing, the Jamaica Company shall have the sole right to terminate this contract, if at that time said Company shall become satisfied that there is not timber enough remaining on said lots to equal in value the amount of the remaining payments to H. A. McLean & Co., or their assigns of record, figured on the above basis of price; but if the Jamaica Company so elect to terminate this contract, and at the time of its termination shall not have cut a sufficient amount of timber to equal the payments already made, then it shall have the right to continue cutting until the amount of timber so cut, together with the logs and lumber now in the mill yard, shall equal in value the amount of the payments already made; but it is distinctly understood and agreed that such right is limited to a period of not over six months from said possible termination of the contract. It is further provided that upon the receipt of such notice by the Windham Company the Jamaica Company shall immediately reconvey to the Windham Company by warranty deed all such portions of the standing timber as remain after satisfying the Jamaica Company for such payment as it has made; and that a *pro rata* adjustment of taxes shall then be made between the two companies.

The Jamaica Company did not terminate the contract as permitted by its terms, but continued the cutting and made all the payments except the last. There was in fact an insufficiency of timber amounting, as found by the chancellor, in general terms, to several hundred dollars. The Jamaica Company did not become satisfied of this fact until sometime in August. The chancellor has found that it might have become satisfied of it within the time limited, in the exercise of due diligence, by going through the several lots and estimating the amounts.

Prior to August 31, Henry A. McLean had negotiations with Piper, attorney of the Windham Company, regarding a

purchase of its interest in this property; and in pursuance of these negotiations McLean and Piper went to Brattleboro September second, and saw D'Arcy, treasurer of the Windham Company, for the purpose of concluding the deal. The three then saw the cashier of the Vermont National Bank, at which the Windham Company's notes to the McLeans were payable, and learned from him that on the 31st day of August, the Jamaica Company had sent to the bank a note for $2,000 dated September first, together with a check for $4,307.20, which were intended to pay the note from the Windham Company to the McLeans due September first, and another of its obligations not connected with this transaction. The first day of September came on Sunday, and the second was a legal holiday. The cashier declined to honor the note because it was dated on Sunday, and returned it to the Jamaica Company on the third. The check was not used and was subsequently cancelled. In the arrangement between Henry A. McLean and the Windham Company, McLean was to cancel a debt due him from the Company of nearly $400, and pay $3,000 in cash. The note due the McLeans from the Windham Company on September first not having been paid because of the cashier's refusal to honor the note of the Jamaica Company as above stated, McLean did not have the means to pay the $3,000; but he drew a check to the Windham Company for $1,000 under date of September third, signing it H. A. McLean & Co., and receipted his bill against the Windham Company, and gave both check and receipt to D'Arcy. D'Arcy had with him deeds of the property, and these were placed in the hands of the cashier to be held in escrow until the amount agreed upon was paid. There was no other written memorandum of the transaction.

When McLean and Piper returned to Jamaica on the evening of the second, Piper told Hollenbeck, a partner in the Jamaica Company, that its note was dated on Sunday, and that it would be returned to the Company; and Hollenbeck saw McLean the same evening, and told him that they were going short of lumber and did not want him to meddle with the property. Neither McLean nor Piper informed Hollenbeck of what had taken place at Brattleboro that day. The chancellor has found that some time previous to this, and pending the nego-

tiations, McLean and Piper knew that the Jamaica Company claimed that the lumber was not holding out, and that there was a chance of a suit between the Jamaica Company and the Windham Company.

On the tenth day of September, Hollenbeck and his solicitor, C. C. Fitts, met McLean and his solicitor, E. B. Gibson, and Fitts then told Gibson that the Jamaica Company was ready to pay the note, if the McLeans would assign to it the note and mortgage without recourse. McLean declined to assign, and commenced this foreclosure proceeding the same day, and obtained an injunction thereon against the Jamaica Company on the following day. On the 17th the Jamaica Company moved for a dissolution of the injunction, and also filed a motion to be subrogated to the rights of the petitioners as against the Windham Company, and furnished a copy of this motion to the petitioners' solicitors. On the same day the chancellor ordered a suspension of the injunction upon payment to the clerk of the amount claimed to be due. On the 18th the Jamaica Company paid to the clerk the amount due on the mortgage with costs. The petitioners took this money from the clerk on the 21st and went directly to the town clerk's office and discharged the mortgage. On the 24th McLean met D'Arcy and A. P. Carpenter, an attorney of the Windham Company, at Greenfield, Mass., and paid the $2,000 remaining due on his purchase, and received newly prepared deeds of the property. The sum paid was deposited with Carpenter to protect McLean. The deeds were immediately forwarded to the town clerk of Jamaica, and were received and filed for record in the afternoon of the 25th. The cross-bill of the Jamaica Company, in which the McLeans and the Windham Company are made defendants, was served on Henry A. McLean in the evening of the same day. This prayed for an order restraining the defendants therein from completing their trade and from changing in any way the record title of the mortgaged property, and for a final decree reinstating the mortgage and subrogating the Jamaica Company to the rights of the McLeans under it.

The chancellor filed a decree sustaining the claims of the Jamaica Company, and appointed a special master to find the difference between the amount paid by the Jamaica Company

on its contract with the Windham Company, and the value of the lumber and timber, cut and standing, sold and conveyed to the Jamaica Company by the Windham Company; the difference representing the amount of loss sustained by the Jamaica Company. The master reported a difference of $2,160.80, with an alternative finding of a larger amount.

It appears from the above statement that the relation between the Windham Company and the McLeans was that of mortgagor and mortgagee, and that the obligation secured was the payment of a certain indebtedness in installments; that the Jamaica Company bought of the mortgagor an interest in the incumbered property upon an undertaking to pay this indebtedness as it became due, with further provisions of obligation and limitation,—all evidenced by a writing to which the McLeans were not a party; and that Henry A. McLean, one of the mortgagees, subsequently bought the mortgagor's equity in the property.

The Jamaica Company claims to be subrogated to all the rights which the orators obtained by their mortgage from the Windham Company. The orators claim all the rights of the Windham Company through Henry A. McLean's purchase of that company's equity. So the case turns upon a determination of the rights of the Windham Company under its contract with the Jamaica Company. The orators contend that the agreement of the Jamaica Company, except for the right of rescission, was an unconditional undertaking to pay the three remaining notes, and thus free the property of the Windham Company from incumbrance; and that in completing the payment after the failure to exercise its option it did no more than the contract required, and so is not entitled to subrogation. The Jamaica Company contends that the extent of its payment on the mortgage was to depend upon the amount of lumber obtained; that the provision limiting the time for taking advantage of an insufficiency of lumber is not of the essence of the agreement, and that its failure to give the stipulated notice does not disentitle it to relief in equity; that the payment to the clerk of the amount of the last note was not a payment of the note otherwise than in support of its claim to subrogation and to procure a suspension of the injunction; and that Henry

A. McLean took the title of the Windham Company with notice, and can stand in no better position than his grantor.

It is clear that McLean took his deed with notice of the claims of the Jamaica Company. It is also clear that the Jamaica Company's payment to the clerk was not a payment of the note in acknowledgment of an unconditional obligation to pay it. But that Company, after becoming satisfied that there was an insufficiency of lumber, undertook to pay the last note on the day it became due, and was prevented from paying it solely by an accident. The orators argue that this was an interpretation of the contract by the Jamaica Company which the Court will follow in determining its rights. But it is not every act of a party indicative of an understanding of the contract in accord with the claim of the other party that will be given this effect. One who goes beyond the requirement of his contract in circumstances of doubt ought not from that fact alone to have his act given the effect of a concession. In this case, the Jamaica Company might reasonably consider, after its failure to terminate the contract within the time limited, that its safest course was to pay the amount of the remaining note at its maturity, and proceed with the cutting until the timber was exhausted; and having thus reimbursed itself as far as possible, and demonstrated the fact and extent of the insufficiency, seek such remedy as the case might then afford.

The orators contend further that any construction of the contract which would give the Jamaica Company the right of subrogation is made impossible by the express provision that each note when paid shall be marked as cancelled and returned to the Windham Company, and that a corresponding partial release of the mortgaged premises shall be filed for record at the time of each payment. But we think this provision cannot be viewed apart from the other stipulations of the contract, and be accepted as a conclusive expression of the intention of the parties. It is true that if the procedure agreed upon by the parties to the contract were carried out by the McLeans, each note would be cancelled on payment and a proportionate part of the security be discharged. But the contract which provides for this final disposition of the notes and security is equally explicit regarding further rights of the Jamaica Company

growing out of the payments. The Jamaica Company is to pay the notes as they become due, but is to have a longer time in which to get off the timber, and to have interest on the sums advanced until a corresponding amount of timber has been secured, if secured within two years from the date of the contract. The Jamaica Company is given the option of terminating the contract at a certain time subsequent to the making of the first payment and before the second is due; and it is provided that if the contract is terminated under this provision, and the Company has not at that time cut enough to equal the payments already made, it shall have the right, subject to a limitation of time, to continue cutting until the required amount is obtained. In view of these further provisions of the contract we think it cannot be said that the provision for cancellation and release is conclusive of the construction and a bar to the Jamaica Company's claim of subrogation.

It is also claimed by the orators that the character of the payments made in taking up the notes is definitely determined by the further provision that upon the delivery of the contract the Jamaica Company shall pay to the Windham Company, in addition to such sums, the difference between the amount of the first note and four thousand dollars. The reasoning seems to be that the payment of this difference is an unconditional payment of a fixed amount; that the sums to which this is an "addition" must have been considered to be of the same character; and that this is inconsistent with the theory of payments depending finally upon the sufficiency of the lumber. But the Jamaica Company contends that this payment is not a payment in addition to the total as determined by the thousand feet, but an advance payment thereon, to be credited to the Jamaica Company in the final settlement. This view is favored by the fact that the payments to be made on the notes are spoken of as "advances." Whatever weight the orators' argument on this point may be entitled to when considered in connection with the entire contract, it is clear that the provision cannot be relied upon as of controlling effect.

But the orators contend that the mere fact that the contract contains a provision permitting the Jamaica Company to terminate it at a certain time, if then satisfied that there was

not a sufficient amount of lumber to meet the payments on the mortgage, is enough to show that the construction they. claim for the contract is correct. It is argued that the manifest purpose of this part of the agreement is to give the Jamaica Company an opportunity to relieve itself of a liability that would otherwise rest upon it. It is doubtless true that the provision allowing the Jamaica Company to withdraw from the contract at the time and for the reason stated, affords some basis for the conclusion that a failure to take advantage of the privilege will make the Company unconditionally liable. Whether this view is of sufficient force to overcome the effect of other features of the contract in ascertaining the construction, must be determined upon a consideration of the agreement as a whole.

The orators insist, moreover, that no effect is given to this provision unless the contract is construed as they claim; but we think this is a mistaken view. The contract, except for the right to terminate, requires the Jamaica Company to advance considerable sums at intervals of three months and before receiving corresponding returns from the lumber, with its right to receive interest on these sums limited to a brief period; leaves it subject to a foreclosure of its interest on a failure to meet any payment when due, and liable to an injunction of its cutting at any time as an impairment of the security; and subjects it to the possibility of a payment in excess of the amount due on its purchase, which, on its construction of the contract, is to be recovered of the Windham Company after final settlement by such remedy as may then be available. Looking to these considerations alone, circumstances are conceivable in which the privilege of withdrawing from the contract before making the second payment, on its own judgment as to the probable result of the cutting, might be a substantial advantage to the Jamaica Company. So the construction contended for by that Company is not at variance with the rule which requires that a contract be so construed, if possible, as to give some effect to every part.

In looking at the contract as a whole we find a noticeable absence of clauses which might naturally have been inserted, some of which would have pointed directly to one conclusion

or the other.  The provisions fixing the prices of the lumber
by the thousand feet and providing for the measurement contain
no express recognition of any other provision that might affect
the result.  The provision directing the application of the avails
in payment of the mortgage contains no express recognition
of its relation to the provisions determining the purchase price.
The stipulation regarding the notice contains no express re-
quirement that the purchaser take measures to satisfy itself
within the time limited as to the quantity of timber left stand-
ing.  It is not stated in terms that in case of a failure to exercise
its option the Jamaica Company shall become primarily holden
for the payment of the mortgage.  The contract contains no
express recognition of a possibility that on final settlement there
may be a balance against the Windham Company.  There is
no express recognition of the possibility that a balance of the
purchase price may remain after satisfying the mortgage to
go directly to the Windham Company.

The Jamaica Company contends that the provision for
terminating the contract is simply a privilege given it in consid-
eration of the agreements on its part.  The argument of the
orators would make the provision an element of the considera-
tion for which the Windham Company conveyed the property.
The fact that the provision for a withdrawal on notice is in the
contract shows plainly enough that the sufficiency of the timber
to satisfy the mortgage had been a matter of discussion between
the parties.  If the negotiations resulted in such an understand-
ing as is claimed by the orators, it is evident that the Jamaica
Company might desire a better opportunity to judge of the
amount of the timber before becoming holden irrevocably for
the full payment of the mortgage.  It is equally evident that
if a privilege of this nature were to be granted, the Windham
Company might desire to have a time limit placed upon the priv-
ilege, the passing of which without action would determine that
the property was finally disposed of and its mortgage provided
for.  But if the understanding reached was that claimed by the
Jamaica Company, we have seen that there were then substan-
tial grounds on which that Company might desire the privilege
of terminating the contract.  Whichever view may be taken,
it is clear that the provision in question is not an undertaking

of some further or different act to be done by the Jamaica Company, but a privilege of withdrawing from further performance; and that the benefit claimed in the right of the Windham Company is not one that would arise from an exercise of the privilege, but from a passing of the time without its exercise.

If we look solely to this particular clause, and determine the scope of the provision by its letter, the course of the argument is plain. · The language of the provision covers only the right to terminate the contract, and the failure to terminate the contract could add nothing to the obligations imposed by it. It would follow from this that if the Jamaica Company is now liable for the full payment of the mortgage it is because the other provisions of the contract made it so, and not because this provision introduced any new obligation, nor because the failure to act under it wrought any change in the contract as framed. Then, if the general provisions of the contract were held not to extend the ultimate liability of the Jamaica Company beyond the value of the lumber obtained, the case would be disposed of without reaching the question presented by the Jamaica Company concerning time as the essence of the contract.

But the matter cannot be thus disposed of without further consideration. Ordinarily the language of a particular provision is to be construed in the light of its purpose, and the purpose is to be gathered from a consideration of the contract as a whole. The general provisions of this contract were framed upon the supposition that there was lumber enough to provide for the mortgage, and evidently contemplate a full payment of the mortgage by the Jamaica Company and a reimbursement of the Company from the lumber when cut and measured. A question having arisen as to the possibility of an insufficiency of lumber, a further provision was inserted for the relief of the Jamaica Company in that event. This provision did not take the form of a contingent modification of the terms already agreed upon, but gave the purchasing Company the right to terminate the contract on its later judgment regarding the quantity of lumber. The nature of the risk arising under the contract which the parties had in mind in making this provision was not expressed in words; so the clause affords no certain guide to the meaning which the parties attached to other parts of the contract.

We find nothing in the contract that absolutely precludes the theory of either party as to the intended effect of this provision. It cannot be said that the orators' claim as to the purpose and effect of the provision is entirely without basis. The Jamaica Company was permitted to withdraw from the contract on account of a supposed insufficiency of lumber; and the most obvious injury that would result to the company from an insufficiency of lumber would be a payment in excess of its value and without other recourse. On the other hand, the permissive character of the provision, and its freedom from all suggestion of an ulterior effect, favor the claim of the Jamaica Company as to the nature of its obligation. Moreover, opposing conclusions may be drawn from certain omissions noticeable in connection with this particular provision. The privilege of terminating the contract carried with it the right to continue cutting until any advance payment was made good. But in this provision, agreed upon with the uncertainty of the quantity specially in view, there is no recognition of any further remedy if the lumber proves insufficient to cover the advance. It may perhaps be argued that this was because there was nothing in the situation to suggest a possibility that at the time the right was to be exercised there would not be lumber enough to equal the payments then made. The time fixed for the notice was May 25, and the principal then paid would be $3,200, and the principal to be paid $6,300. However this may be viewed, it must be regarded as somewhat significant that the preparation of a paragraph on this subject did not lead to the incorporation of something suggestive of the possibility of a final settlement involving more than the elements of price and measurement.

As security holders, the orators are entitled only to payment of the mortgage indebtedness. If they are entitled to anything more, it must be by virtue of Henry A. McLean's purchase of the Windham Company's equity. But this purchase having been made with knowledge of the Jamaica Company's contract and claim, the orators can stand in no better position than the Windham Company did. So the orators' rights are to be measured by the obligations of the Jamaica Company to the Windham Company as evidenced by this contract; and the situation in which the Jamaica Company was left by its failure to give the

notice at the time appointed must be determined by our construction of the contract and the rules of law applicable to the subject.

The Jamaica Company treats the case as presenting the ordinary question whether time is of the essence of the contract, and refers us to the rule as given by Pomeroy, which reads as follows: "In all ordinary cases of contract for the sale of land, if there is nothing special in its objects, subject-matter, or terms, although a certain period of time is stipulated for its completion, or for the execution of any of its terms, equity treats the provision as formal rather than essential; and permits a party, who has suffered the period to elapse, to perform such acts after the prescribed date, and to compel a performance by the other party notwithstanding his own delay." 3 Eq. Jur. §1408. It is well settled, however, that the rule will not be applied when the contract plainly discloses an intention to make exact performance as regards time an essential element of the contract; nor when the failure to perform according to the requirement was wilful and intentional, or the delay unreasonably prolonged; nor when the party entitled to performance has been so injured that complete reparation is impossible.

It may be helpful to state more fully the principal rules by which courts are governed in applying this doctrine. The general rule in equity is that time is not of the essence of the contract, and equity will not treat it as of the essence of the contract unless it affirmatively and clearly appears that the parties so regarded it. 1 Sug. Vend. 8 Am. Ed. 410; *Secomb* v. *Steele,* 20 How. 94, 15 L. ed. 833. It may be made essential by an express stipulation of the parties; or an intention to make it so may be implied from the nature of the property or the avowed object of the seller or purchaser. *Ahl* v. *Johnson,* 20 How. 511, 15 L. ed. 1005. It is not enough that a specific time be named in the contract; the court is to look at the whole scope of the transaction to see whether the parties really meant the time named to be of the essence of the contract. Wald's Pollock on Con., Williston's Ed. 627. It may be made such by a clear manifestation of the intent of the parties in the contract itself, or by a change in the value of the land or other circumstances which would make a decree for a specific performance inequitable. *Barnard* v. *Lee,* 97 Mass. 94.

The commonest application of this doctrine is in cases involving the execution of terms preliminary to the transfer, where the party in default has performed or tendered performance after the time appointed, and seeks to enforce a specific performance by the other party. Here, the controversy relates to the execution of the terms of deferred payment, and the relief sought is not a specific performance, but a subrogation to the rights of the holders of a mortgage regarding which the party seeking relief assumed certain obligations of payment by contract with the mortgagor. The question is not whether the party in default finally acted without unreasonable delay. The Jamaica Company became satisfied of the insufficiency of lumber sometime during the month preceding the maturity of the last note, but it has never given the notice provided for by the contract. It has taken action with a view to the protection of its interests independent of the giving of the notice, by paying into court the amount due on the mortgage. As far as the orators are concerned, as security holders, the payment must be treated as made in time, for the orators have taken the money and discharged the mortgage; and the Windham Company, as mortgagor, has suffered nothing from the fact that payment was not made on the exact day. Any loss it may have sustained must arise from some provision of broader effect than the mere requirement of time.

The real question is, what is the performance which the contract requires? The thing required is the payment of the mortgage as the notes become due. But what is the nature of the payment? Is it a payment on account, for which the Jamaica Company is entitled to credit in the final settlement? Or is it a payment required of the Jamaica Company without reference to the amount of the lumber? Is the obligation of the Jamaica Company after the failure to exercise its option the same as before? The performance previous to the day fixed is upon the assumption that there will be lumber enough to reimburse the Company, and the Company is to continue cutting until reimbursed. But if the lumber had then proved insufficient, would the Windham Company have been chargeable with the deficiency? At the time fixed, the Jamaica Company could terminate the contract on the ground of an insufficiency

of lumber.    Does this mean that if it proceeded with the contract it took the chance of a deficiency?

In seeking the intention of the parties regard must be had to the subject-matter of the contract as well as its language.    The principal subject-matter of this contract was a sale of the timber standing on certain lots.    There was no undertaking on the part of the purchaser to pay a certain amount for the timber as it stood.    The agreement, unless impliedly modified by the provision regarding the mortgage, is to pay for all the lumber by the thousand feet at prices specified.    The measurements of chosen surveyors are to be the basis of settlement.    The mortgage covering the property is to be paid by the purchaser as the installments become due without regard to the amount then cut and measured.    It would not be known with certainty whether there was lumber enough to cover the payments made on account of the mortgage until the final settlement.    The Jamaica Company bought nothing but the standing timber.    Its entire interest in the contract was in the gains to be acquired by the cutting, sawing and marketing.    When the timber was removed the entire realty belonged to the Windham Company.    If the Jamaica Company paid the mortgage, and the amount was more than the value of the lumber, it freed the property of the Windham Company from incumbrance, but acquired nothing for itself.    If the provision for terminating the contract is given the effect claimed by the orators, the transaction will lose its distinctive character as a sale for a consideration depending upon the amount of the property; the agreement to pay so much per thousand feet must yield to the agreement to pay the mortgage; and the Jamaica Company will then pay for the standing timber at rates about twenty per cent in advance of the scale of prices agreed upon.

On the other hand, if the contract is construed as claimed by the Jamaica Company the result to the Windham Company is not inequitable.    There is no claim that the Windham Company lost an opportunity for a better sale through the omission to give notice, or was unfavorably affected by changes in the situation.    If it has lost anything, it is in the failure to have over two thousand dollars of its mortgage paid on account of property which did not exist.

It must be remembered that the act appointed for a certain day was an act to terminate the contract, and not an act to carry forward the performance of the contract; that the omission of the act was the failure to exercise an option, and not a failure in the performance of a positive requirement; that the Jamaica Company has made no subsequent attempt to comply with the letter of the provision, but has undertaken to put itself in the position of having completed the contract; and that the controversy relates, not to the execution of the sale, but to the payment of the consideration. This but brings us back to the question regarding the nature of the payment which the contract calls for, and the answer to this will determine whether the excess of the payment over the contract value of the lumber is chargeable to the Windham Company. So the matter is one of accounting rather than of specific performance; and it is difficult to see how the case as claimed by the Jamaica Company, calls for any direct application of the doctrine that time is not of the essence of the contract.

It is clear that the clause specially under consideration gives the Jamaica Company the right to terminate the contract by notice at a certain time. If this provision were to be viewed simply as an option, independent of its place in a contract in process of execution between parties sustaining the relation of vendor and purchaser, it would seem that the lapse of the time without giving the notice would determine the privilege, and that a notice subsequently given would be of no avail. See *Waterman* v. *Banks*, 144. U. S. 394, 36 L. ed. 479. But this question does not arise, for the Jamaica Company has not undertaken to terminate the contract by giving the notice. If the contract plainly discloses an intention of the parties that the failure to terminate it for an insufficiency of lumber on the very day named should make the Jamaica Company chargeable with the removal of the incumbrance whatever the deficiency of lumber, then the time fixed is necessarily of the essence of the contract. But this is merely one of two opposite conclusions that may be arrived at from a consideration of the contract as a whole. The Jamaica Company stands upon the claim that by a fair construction of the contract the parties to it never contemplated that the purchaser should be or become absolutely

holden to satisfy the mortgage. We think the question for determination may, with a sufficient recognition of the different phases of the inquiry, be stated as follows: Did the provision permitting the Jamaica Company to terminate the contract by notice at a given time, if then satisfied there was an insufficiency of lumber, sustain such a relation to the contract that the lapse of the time appointed without giving the notice made or left that Company liable for the payment of the mortgage in full, regardless of the amount of the lumber and without recourse to the Windham Company?

The original conception of the parties, as evidenced by the contract, was a sale of standing timber, to be paid for by the thousand feet when cut and measured; with an undertaking on the part of the purchaser to pay the mortgage covering the property in advance of the cutting, on account of the moneys coming due to the seller. The payments on the mortgage are called "advances," and are to draw interest until they are equalled by the value of the lumber measured. The parties were evidently dealing upon a supposition that there would be at least lumber enough to make good the payments on the mortgage. But provision was made for the Jamaica Company's withdrawal from the undertaking before making the second payment, if it became satisfied that there was an insufficiency of lumber. Various reasons for desiring this privilege, other than an understanding that the contract made it unconditionally liable, have already been suggested. The provision being in terms a privilege, the failure to act under it should not be held to charge the Jamaica Company with an increased liability without the support of some expression fairly indicative of such an intention. If we look upon the contract as entirely ambiguous the result will be the same. When the terms of a contract leave its meaning in doubt, the Court will ascribe to the parties an intention to enter into a fair agreement, and will adopt the construction which makes the contract equitable. *Royalton* v. *Royalton etc. Co.*, 14 Vt. 311; *Bell* v. *Bruce,* 1 How. 169, 11 L. ed. 89. We think the failure of the Jamaica Company to become satisfied of the insufficiency of lumber within the time limited, and its consequent failure to give the notice, did not subject it to a liability inconsistent with the general theory of the contract.

The view we have taken sustains the contention of the Jamaica Company that the initial payment made directly to the Windham Company was an advance payment on the total purchase price as determined by the measurements. The chancellor's order was properly construed by the master in excluding the orators' offers of evidence to show the actual value of the lumber. During the progress of the job, authorized persons severally representing the companies concurred in scaling the poplar logs as hard wood. The master finds that poplar is a soft wood. No intermediate action having been taken on the figures, there is no reason why the erroneous classification should not be corrected.

It is said there is nothing to show that Mrs. McLean ever heard of this contract, or of any claim of subrogation by the Jamaica Company; and that she is entitled to hold her half of the money paid on the mortgage unaffected by subrogation. It is apparent from the manner in which the facts are presented that no question was made before the chancellor as to McLean's authority to act for his wife. The fact is found that a part of the consideration of the purchase of the Windham Company's equity was paid by a check of H. A. McLean & Co., and there is no suggestion in Mrs. McLean's behalf that this was unauthorized. No distinction is made between the two in the findings bearing upon the matter of notice. The case states that the orators' solicitors had notice of the Jamaica Company's motion for subrogation, and that the orators afterwards took the money paid to the clerk and discharged the mortgage on the record. Enough appears to subject Mrs. McLean to the decree.

*Decree affirmed and cause remanded.*